UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ACME WIDGET, L.P.,

               Plaintiff,

        - against -

Q INVESTORS GROUP, INC.,

               Defendant.

-------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

10 CV 2204 (SLT)

On May 13, 2010, plaintiff Acme Widget, L.P. ("Acme") filed this action, alleging claims

of trademark infringement by defendant Q Investors Group, Inc. ("Q Investors"), in violation of

the Lanham Act, 15 U.S.C. §§ 1051 et seq. Following service of the Summons and Complaint

on August 19, 2010, the defendant failed to appear or respond to the Complaint and on

November 2, 2010, plaintiff moved for entry of a default and for default judgment. The Clerk of

Court entered a default against the defendant on November 15, 2010 and the motion for default

judgment was thereafter referred to the undersigned to prepare a Report and Recommendation as

to damages.


### FACTUAL BACKGROUND

The Complaint alleges that plaintiff Acme Widget is one of several related entities that

comprises the "Q Investments Group," which provide investment-related services to investors

throughout the United States. (Compl.[1] ¶ 5). Acme is the sole and exclusive owner of the

federally registered trademark "Q INVESTMENTS," Registration No. 2,892,122, in connection

---

[1]Citations to "Compl." refer to Plaintiff's Original Complaint, filed May 13, 2010.

with "'financial investment services, namely providing specialized securities investments for accredited investors.'" (Id. ¶ 6, Ex. 1[2]). In addition to the Q INVESTMENTS mark, Acme holds 11 other marks, with registrations that are in full force and effect. (Id. ¶ 7, Ex. 2[3]). These trademarks are referred to collectively as the "Q Investments marks." (Id. ¶ 8). According to Acme, its first use of the Q INVESTMENTS mark occurred as early as October 1, 1994 (id. ¶ 6), and since then the marks have acquired distinctiveness, and are "well-known, famous, inherently distinctive." (Id. ¶ 9). Plaintiff alleges that it has expended great effort in advertising and promoting its services under the Q INVESTMENTS marks and, as a result, the marks have become widely associated with Acme and the Q Investments Group and represent valuable assets to the plaintiff. (Id.)

Plaintiff alleges that defendant Q Investors Group is a recently formed investment advisor that provides services similar to those provided by Acme and Q Investments Group. (Id. ¶¶ 10, 11). According to plaintiff, defendant did not use the name Q Investors Group prior to August of 2009. (Id. ¶ 10). Plaintiff alleges that the use of the name "Q Investors Group" is likely to confuse consumers into believing that its services are connected with, endorsed by, or otherwise affiliated with plaintiff and the Q Investments Group, resulting in a dilution of the strength of Acme's registered mark. (Id. ¶ 12). Accordingly, plaintiff brings this action, seeking damages and injunctive relief under Sections 43(a)(1)(A) and 43(c) of the Lanham Act, 15 U.S.C. §§

---

[2]Citations to "Ex. 1" refer to the copy of the Q INVESTMENTS Trademark registration, which is attached as Exhibit 1 to the Complaint.

[3]Citations to "Ex. 2" refer to the copies of the other Acme trademark registrations which are attached as Exhibit 2 to the Complaint.

2

1114(1), 1125(a)(1)(A).

Following defendant's failure to respond to the Summons and Complaint, plaintiff moved for entry of a default on November 2, 2010, and the Clerk entered a notation of default on November 15, 2010. The motion was thereafter referred to the undersigned to conduct an inquest and issue a Report and Recommendation as to damages. The Court held an inquest hearing on September 28, 2011, at which plaintiff appeared and presented damages. Defendant did not appear and has not submitted any response to plaintiff's motion for default judgment.

Accordingly, having considered the plaintiff's submissions, the Court respectfully recommends that plaintiff's motion for default judgment be granted as set forth below.

## DISCUSSION

### A. Default Judgment

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. P. 55(a). Rule 55 sets forth a two-part procedure for entering a default judgement. See Fed. R. Civ. P. 55(b)(2); Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992); see Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993). Pursuant to Rule 55(a), the court clerk first enters a default by noting the defaulting party's failure to respond or appear. See id. If the defaulting party then fails to successfully vacate the default pursuant to Rule 55(c), the court may enter a

3

default judgment. Id. Where the amount of damages owed requires a judicial finding, a default judgment may be entered once the court has conducted a hearing or made a referral to determine the question of damages. See Fed. R. Civ. P. 55(b).

In determining whether a default judgment should be entered, the Second Circuit has cautioned that a default judgment is an extreme remedy that "must remain a weapon of last, rather than first, resort." Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the pressure on district courts "to dispose of cases that . . . delay and clog . . . [their] calendar[s]" due to the litigants' "disregard of the rules," the Court held that district courts must "maintain a balance between clearing . . . [their] calendars and affording litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95–96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," defaults are "generally disfavored" and doubts should be resolved in favor of the defaulting party. Id. Furthermore, "[Rule 55(b)] states that a judgment by default 'may' be entered under specified circumstances, not that it must." Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (ordering an inquest to determine damages and stating that where the court enters a default judgment, it is required to "supervise [that entry] . . . with extreme care to avoid [a] miscarriage[] of justice"). Accordingly, plaintiff is not entitled to a default judgment as a matter of right, simply because the defendants are in default. Id.

The court has significant discretion and may consider a number of factors in deciding whether to grant a default judgment, including "'the amount of money potentially involved' (citation omitted) and 'whether the grounds for default are clearly established.'" Hirsch v.

4

Innovation Int'l, Inc., 1992 WL 316143, at *2 (quoting Charles A. Wright, et al., 10 Fed. Practice and Procedure: § 2685, at 425-26 (2d ed. 1983)). The greater the amount of money involved, the more careful a court should be in entering a default judgment. See id. Additionally, a court may consider whether the facts alleged in the complaint state a valid cause of action, whether there are unresolved questions regarding material issues of fact as to liability or damages, whether plaintiff has been substantially prejudiced by the delay involved, and how harsh an effect a default judgment might have on the defendant. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981) (discussing factors); Charles A. Wright, et al., 10A Fed. Practice & Procedure, §§ 2685, 2688 (3d ed. 1998).

In this case, it is beyond dispute that defendant is in default since the defendant has failed to file an answer to the Complaint, and failed to challenge the Court's entry of a default. See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (holding that defendant's default was "crystal clear" as evidenced by its failure to oppose the plaintiff's motion for a default judgment). Moreover, because the defendant is a corporation, the defendant's failure to obtain counsel constitutes a failure to defend because corporations cannot proceed pro se in federal court. See Shapiro, Bernstein & Co. v. Cont'l Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam) (stating that "it is settled law that a corporation cannot appear other than by its attorney"); see also Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983) (discussing the rationale for requiring corporations, as "artificial" entities, to appear through counsel only). Further, the amount of damages plaintiff seeks in this case is not large enough to give this Court pause. See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (declining to enter default

5

judgment, as plaintiff's request for damages ran "well into the millions of dollars," and giving defendant an opportunity to contest the default judgment).

Despite the numerous opportunities afforded defendant, it has neither contested the default, nor has it retained counsel. Accordingly, there is no compelling reason to delay further in the entry of a default judgment.

## B. Plaintiff's Claims

When a defendant defaults, the defendant is deemed to have admitted every well-pleaded allegation of the complaint, "except those relating to damages." See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65; Wing v. East River Chinese Rest., 884 F. Supp. 663, 669 (E.D.N.Y. 1995); Deshmukh v. Cook, 630 F. Supp. 956, 959 (S.D.N.Y. 1986). The Court, however, must review the allegations in the complaint to determine if the elements of each claim have been adequately pleaded. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65.

### 1. Standards for Infringement Under the Lanham Act

Section 43(a) of the Lanham Act prohibits a person from using "any word, term, name, symbol, or device, or any combination thereof," 15 U.S.C. § 1125(a), that is used "in commerce . . . in the ordinary course of trade," 15 U.S.C. § 1127, and "which. . . is likely to cause confusion. . . as to the origin, sponsorship, or approval of his or her goods. . . ." 15 U.S.C. § 1125(a)(1). See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114, 115-16 (2d Cir. 2006). In explaining the objectives of the Lanham Act, the Supreme Court noted that the Act

6

"'does not exist to reward manufacturers for their innovation in creating a particular device;' . . . but rather, by preventing competitors from copying 'a source-identifying mark,' 'reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure a producer that it. . . will reap the financial, reputation-related rewards associated with a desirable product.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29, 34 (2003) (quoting Tratflix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 34 (2001), and Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 163-64 (1995)).

In order to sustain a cause of action for trademark infringement, the plaintiff must establish two elements: (1) that "the mark or dress is distinctive as to the source of the good or service at issue," and (2) "that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant." ITC Limited v. Punchgini, Inc., 482 F.3d 135, 154 (2d Cir. 2007) (citing cases); see also Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 115 (reciting the two-prong test described in Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993)). However, before analyzing if plaintiff has met both prongs of this test, "plaintiff must demonstrate its own right to use the mark or dress in question." ITC Limited v. Punchgini, Inc., 482 F.3d at 154 (citing cases). Plaintiff must show priority of right over defendants in order to be entitled to relief. See P. Daussa Corp. v. Sutton Cosmetics (P. R.), Inc., 462 F.2d 134, 136 (2d Cir. 1972).

The Lanham Act permits "[t]he owner of a trademark used in commerce [to] request registration of its trademark." 15 U.S.C. § 1051. However, registration is not necessary because the Lanham Act also protects unregistered trademarks from infringement. See EMI Catalogue

7

P'ship v. Hill, Holiday, Connors, Cosmopulos Inc., 228 F.3d 56, 61 (2d Cir. 2000). Claims for trademark infringement of a registered mark brought pursuant to 15 U.S.C. § 1114(1), and claims for infringement of rights in a mark acquired solely by use, brought pursuant to 15 U.S.C. § 1125(a), are analyzed under this same Gruner test. See Virgin Enterprises Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003).

Under the second prong of the Gruner test, the Court must determine whether there is a "likelihood of confusion." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 115. "Likelihood of confusion is the keystone of trademark infringement." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 430 (S.D.N.Y. 2004), aff'd in part, vacated in part, and remanded, 454 F.3d 108 (2d Cir. 2004). In Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961), the Second Circuit set out a non-exclusive, multi-factor test that considers, among other things: "(1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap, (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 116.

## 2. Analysis

In this case, plaintiff alleges that it is the registered owner of the "Q INVESTMENTS" mark, as well as a series of other federally registered marks, and that it registered these marks long before defendant's first use of the competing mark. Plaintiff further alleges that the "Q

8

INVESTMENTS" mark is distinctive as to the source of the investment services that plaintiff provides. Plaintiff also claims that the "Q INVESTORS GROUP" mark, which the defendant uses in connection with the same type of services, is so similar that there is a likelihood of confusion between the plaintiff's services and those of the defendant, leading to the potential dilution of the value of plaintiff's mark.

Having reviewed the allegations in the Complaint, the Court finds that plaintiff has sufficiently alleged the elements of a claim under the Lanham Act for trademark infringement.

## C. Injunctive Relief

In this case, plaintiff seeks an injunction, preventing "defendant, its assigns, representatives, officers, directors, shareholders, agents, employees, independent contractors, servants," and others, from "using, promoting, advertising, offering for sale, selling or otherwise distributing any goods or services under the name of 'Q Investors Group' or any other infringing mark using the name Q Investors Group as a trade name, in trade publications or otherwise." (Compl. ¶ (5)). Plaintiff seeks an additional Order requiring defendant to destroy any articles, such as signage and business cards that include the infringing mark. (Id. ¶ (8)).

"To obtain a permanent injunction in a trademark infringement case, a 'plaintiff must demonstrate actual success on the merits and irreparable harm.'" Protection One Alarm Monitoring, Inc. v. Executive Protection One Security Service, LLC., 553 F. Supp. 2d 201, 205 (E.D.N.Y. 2008) (internal citations omitted). Turning first to the issue of irreparable injury, it is well-established that Section 1116(a) of the Lanham Act specifically authorizes the court "to

9

grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under section 1125(a) of this title." 15 U.S.C. § 1116(a) (1997). In trademark cases, "'a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm.'" Protection One Alarm Monitoring, Inc. v. Executive Protection One Security Service, LLC., 553 F. Supp. 2d at 205-206 (E.D.N.Y. 2008) (citing Am. Cyanamid v. Campagna per le Farmacie in Italia, S.P.A., 847 F.2d 53, 55 (2d Cir. 1988)). Although actual confusion or deception as to the source of manufacture or ownership of the products must be shown in an action to recover monetary damages under the Lanham Act, only a likelihood of confusion or deception as to the source is necessary before injunctive relief will be granted. See Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 79 (2d Cir. 1981); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2d Cir. 1979).

Thus, the first step in analyzing plaintiffs' claim is to determine whether there is a likelihood of confusion and then "balance the equities," taking into account the interests of plaintiffs, defendants, and the public. McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1139-40 (2d Cir. 1979); Scarves by Vera, Inc. v. Todo Imports, Ltd., 544 F.2d 1167, 1172 (2d Cir. 1976).

> To determine the likelihood of confusion, courts generally consider
> a number of non-exclusive factors, including: (1) the strength of
> the mark; (2) the similarity between the two marks; (3) the
> proximity of products in the marketplace; (4) evidence of actual
> confusion; (5) defendant's bad faith; (6) the quality of defendant's
> product or service; and (7) the sophistication of the relevant
> consumer group . . . . The strength of a mark is measured by "'its

10

> tendency to identify the goods sold under the mark as emanating
> from a particular . . . source'". . . . The "proximity of products"
> element addresses whether the two products compete with each
> other.

Protection One Alarm Monitoring, Inc. v. Executive Protection One Security Service, LLC., 553

F. Supp. 2d at 206 (citing Western Publ'g Co. v. Rose Art Indus., Inc., 910 F.2d 57, 61 (2d Cir.

1990) and Marshak v. Thomas, No. CV-98-2550, 1998 WL 476192, at *8 (E.D.N.Y. June 11,

1998)).

In this case, plaintiff has alleged that there is a likelihood of confusion due to the

similarity of defendant's mark ("Q INVESTORS GROUP") to the plaintiff's registered mark ("Q

INVESTMENTS") and the identical nature of the services provided by defendant and plaintiff.

(Pl.'s Mem. at 4). Plaintiff also alleges that monetary relief alone is insufficient to remedy the

harm because "damage to Acme's goodwill and brand name cannot be easily quantified." (Id. at

5). Given the absence of any response by defendant, the Court finds that there is a likelihood of

confusion and, balancing the equities, the Court respectfully recommends the entry of a

permanent injunction preventing defendants from using the name "Q INVESTORS GROUP,"

and the issuance of an Order requiring defendant to destroy any articles, such as signage and

business cards, that include the infringing mark.

## D. Damages

It is well-settled that the burden is on the plaintiff to establish its entitlement to recovery.

See Clague v. Bednarski, 105 F.R.D. 552 (E.D.N.Y. 1985). When a default judgment is entered,

the defendant is deemed to have admitted all well-pleaded allegations in the complaint pertaining

11

to liability. See Greyhound Exhibit Group, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993); Montcalm Publ'g Corp. v. Ryan, 807 F. Supp. 975, 977 (S.D.N.Y. 1992) (citing United States v. Di Mucci, 879 F.2d 1488, 1497 (7th Cir. 1989)); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65; Deshmukh v. Cook, 630 F. Supp. 956, 959 (S.D.N.Y. 1986); 6 Moore's Federal Practice ¶ 55.03[2] at 55-16 (2d ed. 1988). However, the plaintiff must still prove damages in an evidentiary proceeding at which the defendant has the opportunity to contest the claimed damages. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158. "'While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation.'" Levesque v. Kelly Communications, Inc., No. 91 CV 7045, 1993 WL 22113, at *4 (S.D.N.Y. 1993) (quoting Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)).

`       Section 35 of the Lanham Act governs the types of monetary relief available in cases of trademark infringement and unfair competition. 15 U.S.C. § 1117. See Polo Fashions, Inc. v. Rabanne, 661 F. Supp. 89, 95 (S.D. Fla. 1986). The statute authorizes the plaintiff "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action" where plaintiff can establish a violation of his rights as a registered trademark holder. 15 U.S.C. § 1117(a). The Lanham Act further provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Id. Thus, plaintiffs in a Lanham Act action are not limited to recovery of their actual damages but "may recover profits reaped by the defendants from their infringing activity." Louis

12

Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973 (2d Cir. 1985) (citing Monsanto
Chem. Co. v. Perfect Fit Prod. Mfg. Co., 349 F.2d 389, 396-97 (2d Cir. 1965), cert. denied, 383
U.S. 942 (1966)). It is clear that in determining what the proper compensation would be in a case
of trademark infringement, the court has "broad equitable discretion," Taylor Made Golf Co. v.
Carsten Sports, Ltd., 175 F.R.D. 658, 661 (S.D. Cal. 1997), and courts have considered a
defendant's "willful and deliberate behavior" in fashioning an award that will act as an
appropriate deterrent. Polo Fashions, Inc. v. Rabanne, 661 F. Supp. at 96; see also W.E. Bassett
Co. v. Revlon, Inc., 435 F.2d 656, 662 (2d Cir. 1970) (finding "bad faith and wrongful intent"
and awarding profits where defendant's actions "are surrounded by an aura of indifference to
plaintiff's rights and a smug willingness to determine unilaterally that the good will plaintiff had
sought to foster could safely be treated as a nullity").

In this case, plaintiff has indicated that it is willing to forego a claim for monetary
damages in connection with this default. Instead, as discussed supra, the plaintiff seeks only an
Order requiring destruction of the infringing items, a permanent injunction, and attorneys' fees
and costs. The request for fees and costs is addressed below.


E. Attorney's Fees and Costs

Pursuant to 15 U.S.C. § 1117, plaintiff is entitled to an award of reasonable attorney's
fees and costs, where, as here, defendant has engaged in intentional, knowing, and willful
infringement. See Bambu Sales, Inc. v. Ozak Trading, Inc., 58 F.3d 849, 854 (2d Cir. 1995);
Guess ? Inc. v. Gold Center Jewelry, 997 F. Supp. 409, 412 (S.D.N.Y.), rev'd on other grounds,

13

158 F.3d 631 (2d Cir. 1998), cert. denied 525 U.S. 1106 (1999); see also Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp. 2d 161, 170 (S.D.N.Y. 1999) (awarding attorney's fees in light of defendant's "willful defiance and protraction of judicial processes"); Polo Fashion, Inc. v. Rabanne, 661 F. Supp. at 98. Here, based on the defendant's default, it is deemed to be a willful infringer, Lyons P'Ship, L.P. v. D&L Amusement, Inc., 702 F. Supp. 2d 104, 119 (E.D.N.Y. 2010), and, in the absence of any extenuating circumstances, this Court respectfully recommends that attorney's fees be awarded to plaintiff.

### 1. Attorney's Fees

In support of its request for attorney's fees, plaintiff has submitted the Declarations of Molly Buck Richard, Esq. and James J. Morrissey, Esq., seeking a total of $12,674.71 in fees.

#### a. Standards

In determining an appropriate fee award, the Court looks to Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany and Albany County Board of Elections, 522 F.3d 182, 183-84 (2d Cir. 2008), where the Second Circuit "'abandon[ed]' the 'lodestar' approach to awarding attorney's fees," Simmons v. New York City Transit Auth., 575 F.3d 170, 175 (2d Cir. 2009), and held that when assessing whether claimed legal costs are reasonable, the Court determines the "presumptively reasonable fee" for an attorney's services by looking to what a reasonable client would be willing to pay, "'bear[ing] in mind *all* of the case-specific variables'" that the courts have identified as relevant in setting a reasonable hourly rate. Id. at

14

172 (quoting Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 522 F.3d at

190) (emphasis in original).

In order to calculate the presumptively reasonable fee, the Court must first determine a

reasonable hourly rate for the legal services performed. Id. The Second Circuit has adopted the

following factors, inter alia, to guide the court's inquiry as to what constitutes a reasonable

hourly rate:

> (1) the time and labor required; (2) the novelty and difficulty of the
> questions; (3) the level of skill required to perform the legal service
> properly; (4) the preclusion of employment by the attorney due to
> acceptance of the case; (5) the attorney's customary hourly rate; (6)
> whether the fee is fixed or contingent; (7) the time limitations
> imposed by the client or the circumstances; (8) the amount involved
> in the case and the results obtained; (9) the experience, reputation,
> and ability of the attorneys; (10) the "undesirability" of the case; (11)
> the nature and length of the professional relationship with the client;
> and (12) awards in similar cases . . . .

Id. at 187 n.3 (citing Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.

1974), abrogated on other grounds by Blanchard v. Bergeron, 489 U.S. 87 (1989)). A number of

recent cases have applied some of these Arbor Hill factors when awarding attorney's fees. See

Vilkhu v. City of New York, No. 06 CV 2095, 2009 WL 1851019 (E.D.N.Y. June 26, 2009); see

also Cruz v. Henry Modell & Co., Inc., No. 05 CV 1450, 2008 WL 905351, at *3 (E.D.N.Y. Mar.

31, 2008).

Courts are also instructed to balance:

> the complexity and difficulty of the case, the available expertise and
> capacity of the client's other counsel (if any), the resources required
> to prosecute the case effectively . . ., the timing demands of the case,
> whether the attorney might have an interest (independent of that of his
> client) in achieving the ends of the litigation or might initiate the
> representation himself, whether the attorney might have initially acted
> pro bono . . ., and other returns (such as reputation, etc.) the attorney
> might expect from the representation.

15

Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d at 184.

In determining the appropriate rate to be charged, the Second Circuit has indicated that courts may consider evidence of prevailing rates for similar services beyond the fee application itself. See Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1059 (2d Cir. 1989). In addition to the parties' evidentiary submissions, the Court may consider its own experience and familiarity with the case and with rates generally charged. See Cruz v. Local Union No. 3, 34 F.3d 1148, 1160 (2d Cir. 1994) (noting that "[a] district court's 'choice of rates [is] well within [its] discretion'") (quoting Cabrera v. Jakobovitz, 24 F.3d 372, 393 (2d Cir. 1994), cert. denied, 513 U.S. 876 (1994)). To "inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984).

Indeed, the Second Circuit has held that in calculating the presumptively reasonable fee, "courts 'should generally use the hourly rates employed in the district in which the reviewing court sits.'" Simmons v. New York City Transit Auth., 575 F.3d at 174 (holding that when awarding attorney's fees, there is a presumption in favor of relying on the rates where the case is litigated, not where the attorneys are located) (citations omitted).

### b. Rates Requested

According to the Declaration of Ms. Richard, she is an attorney with the firm of Richard

16

Law Group ("RLG"), located in Dallas, Texas. She has represented Acme in trademark matters since approximately 1999. (Richard Decl.[4] ¶ 2). She states that in April 2010, Acme became aware of the defendant's use of the mark and retained her firm to represent Acme in this matter. (Id.)

Ms. Richard explains that she has been practicing in Texas since 1981, specializing in trademark and copyright law; she bills at the rate of $400 per hour. (Richard Decl. ¶ 3). The other attorney from the Richard Law Firm on this case is Elizann Carroll, who has been practicing in Texas since 1993, but who has appeared in other courts, including the Southern District of New York on a pro hac vice basis. (Id.) She bills at an hourly rate of $350 per hour. (Id.)

On or about April 22, 2010, Acme retained the firm of Morrissey & Morrissey, LLP, located in New York City, N.Y., to act as lead litigation counsel on this matter. (Morrissey Decl.[5] ¶ 3). According to the Declaration of Mr. Morrissey, he has been practicing law in New York since 1965, and his resume lists his area of practice as "Trusts and Estates, Estate Planning, Estate Litigation. (Id. ¶ 4, Ex. A). As a senior partner in the firm, he charges at the rate of $600 per hour. (Id. ¶ 3). According to Mr. Morrissey, the other attorney who billed time on this matter was Sabrina E. Morrissey, Esq., who was first licensed to practice law in New York in 1995. Although not admitted to Federal Court, she provided "legal support" on this case, by

---

[4]Citations to "Richard Decl." refer to the Declaration of Molly Buck Richard, Esq., dated August 31, 2011.

[5]Citations to "Morrissey Decl." refer to the Declaration of James Morrissey in Support of Attorneys' Fees, dated September 1, 2011.

"reviewing documents, filing documents. . . and coordinating with the Richard Law Group. . . ."
(Id. ¶ 5). She also lists her area of specialty as "Trusts and Estates, Probate and Guardianship
matters." (Id., Ex. B). As a junior partner, she bills at the rate of $300 per hour.

Having reviewed the fee applications of counsel and considered the rates being requested,
the Court finds that the rates are somewhat high in light of the fees generally considered
reasonable in the Eastern District of New York for this type of work. Following the decision in
Simmons, rates of $300 to $400 per hour for partners have been considered reasonable in the
Eastern District. See, e.g., Gutman v. Klein, No. 03 CV 1570, 2009 WL 3296072, at *3
(E.D.N.Y. Oct. 13, 2009) (awarding attorney's fees due to spoliation of evidence). See also Blue
Moon Media Group, Inc. v. Field, No. CV 08–1000, 2011 WL 4056068, at *13 (E.D.N.Y. Apr.
11, 2011) (reducing rate of partner to $400 per hour and rate of associates to $175 to $325 per
hour); BBY Solutions, Inc. v. Schwartz, No. CV 11–0947, 2011 WL 6986937, at *7 (E.D.N.Y.
Nov. 17, 2011) (limiting rate of partners to $400 and approving rates of associates ranging from
$150 to $310 per hour, based on years of experience); Melnick v. Press, No. 06-CV-6686, 2009
WL 2824586, at *9 (E.D.N.Y. Aug. 28, 2009) (holding that rates in the Eastern District vary
from $200 to $375 per hour for partners and $100 to $295 per hour for associates); Moran v.
Sasso, No. 05 CV 4716, 2009 WL 1940785, at *4 (E.D.N.Y. July 2, 2009) (stating that in the
Eastern District of New York, reasonable hourly rates have ranged from $200 to $350 for
partners and $200 to $250 for senior associates); Duverger v. C & C Duplicators, Inc., No.
08-CV-0721, 2009 WL 1813229, at *2 (E.D.N.Y. June 25, 2009) (stating that rates from $200 to
$350 for partners, $200 to $250 for senior associates are reasonable); Rodriguez v. Pressler &

18

Pressler, LLP, 06 CV 5103, 2009 WL 689056, at *1 (E.D.N.Y. Mar. 29, 2009) (holding that hourly rates of $450 and $300 were reasonable for a Fair Debt Collection Practices Act case).

Although this case involves trademark matters which may be more complicated in some cases and require a certain amount of specialized expertise, here the work that was performed in this case was relatively straightforward. The majority of time spent was in drafting the Complaint and the papers in connection with the default. (See discussion infra at 19). Under these circumstances, the Court finds that the rates requested are not in line with the reasonable rates requested in this district and accordingly, recommends that the following rates be applied:

> James J. Morrissey - $375 per hour
> Molly Buck Rogers - $325 per hour
> Elizan Carroll - $300 per hour
> Sabrina E. Morrissey - $275 per hour

### c. Hours Billed

Turning to the number of hours billed for this matter, plaintiff seeks a total award of fees, representing 12.4 hours of work by Morrissey & Morrissey and 18.4 hours of time spent by the Richard Law Group from April 22, 2010 through March 11, 2011. (Richard Decl. ¶ 4, Ex. C; Morrissey Decl., Ex. C). In accordance with the requirements of the Second Circuit in New York Association for Retarded Children v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983), plaintiffs have submitted a computer-generated printout of their attorneys' contemporaneous time records, showing for each attorney, the dates worked and the amount of time spent on this case, along with a precise description of the tasks performed. According to the invoices submitted by Ms. Richard, her firm spent 3.6 hours drafting the Complaint, while Mr. Morrissey's firm spent

19

approximately 1.9 also working on the Complaint. The lawyers spent a total of 13.9 hours on the drafting of the papers in support of the default motion and the request for lawyers' fees. Ms. Richard's firm spent 9.1 hours on those tasks, while Mr. Morrissey's firm spent another 4.8 hours preparing for the default proceedings. Not only were the legal papers submitted in this case fairly simple and straightforward,[6] but there appears to have been a certain amount of duplication of effort in this case. The collaboration of multiple attorneys on research and drafting the Complaint and Memorandum of Law in Support of the Motion for Default Judgment appears to have led to a duplication of work and redundancy in billing. While this case may have been slightly more complicated than the average default, the majority of the time was spent on the preparation of the Complaint and the default papers, and appearance at the inquest hearing. There was no discovery conducted and no conferences held with the Court prior to the inquest proceeding. Thus, it is unclear why 29.8 hours of the lawyers' time were required to litigate this matter.

In reviewing a fee application, the court "should exclude excessive, redundant or otherwise unnecessary hours." Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1997) (citing Hensley v. Eckerhart, 461 U.S. 424, 433-35 (1983)); see also Rotella v. Board of Educ., No. CV 01–0434, 2002 WL 59106, at *3-4 (E.D.N.Y. Jan. 17, 2002) (applying percentage reduction to fees of several attorneys for excessive and redundant billing); Quinn v. Nassau City Police Dep't, 75 F. Supp. 2d 74, 78 (E.D.N.Y. 1999) (reducing one attorney's fees by 20% and

---

[6]The Complaint was only nine pages long and the Memorandum in Support of the default judgment contained eight pages, of which only four pages were dedicated to legal analysis.

20

another by 30% for unnecessary and redundant time); Perdue v. City Univ. of N.Y., 13 F. Supp. 2d 326, 346 (E.D.N.Y. 1998) (imposing a 20% reduction for redundancy); American Lung Ass'n v. Reilly, 144 F.R.D. 622, 627 (E.D.N.Y. 1992) (finding that "the use of so many lawyers for relatively straightforward legal tasks was excessive and led to duplication of work," and deducting 40% of plaintiffs' hours).

Given the fairly straightforward nature of plaintiff's claims and these proceedings and the relatively short length of plaintiff's submissions, the Court respectfully recommends that the number of hours requested by plaintiff be reduced by 20% to account for the redundant and unnecessary time and duplication of effort spent drafting, researching, and preparing for these proceedings.

Thus, the Court recommends an award of $7,986.00 in attorney's fees, calculated by multiplying 22.35 hours (29.8 hours reduced by 20%) by the reduced rates recommended above. The amounts to be awarded are set forth below:

(1)     $3,368.00 for work completed by Morrissey & Morrissey, LLP

(2)     $4,618.00 for work completed by the Richard Law Group.


2. Costs

Plaintiffs also seek an award of disbursements and other expenditures in the amount of $1,105.36. "[S]ubject to the principles of equity," costs are awarded in default. See Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp.2d at 170-71 (citing 15 U.S.C. § 1117(a)). Under the Lanham Act, the prevailing party is entitled to recover its reasonable costs in pursuing the

21

action. 15 U.S.C. § 1117, Fed. R. Civ. P. 54(d).

According to Ms. Richard's Declaration, plaintiffs seek disbursements for court and filing fees, service of process fees and online research fees. These appear to be reasonable and the Court respectfully recommends that plaintiff be awarded these costs and charges.[7]

## CONCLUSION

In summary, this Court respectfully recommends that a permanent injunction enter as follows:

(1) Defendant Q Investors Group, Inc. shall be restrained and enjoined from directly or indirectly making use for themselves or any other person, firm, or corporation of the name "Q Investors Group," including, but not limited to, the trade name, service marks, and copyrighted materials or any part thereof, including the mark "Q Investors Group" or any variance thereof; and

(2) Defendants shall be directed to take all action necessary to destroy all articles, including, but not limited to, signage, business cards, and promotional or advertising materials, that contain the mark "Q Investors Group" or any variance thereof.

---

[7]In the Morrissey Declaration, there appears to be a request for $1,314.67 for costs and disbursements. (Morrissey Decl., Ex. C at 2). Among the items requested are a $350 filing fee as well as a fee of $226.75 for process server fees. (Id.) Since these costs seem to be incorporated in the Richard request and therefore are duplicative, the Court has not awarded any additional amount for the costs requested in the Morrissey papers.

It is further recommended that plaintiffs be awarded:

    (1)    $7,986.00 in attorneys' fees; and

    (2)    $1,105.36 in costs.

Any objections to this Report and Recommendation must be filed with the Clerk of the

Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure

to file objections within the specified time waives the right to appeal the District Court's order.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b); Small v. Sec'y of Health and Human

Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties

either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      February 10, 2012

                                      Cheryl L. Pollak
                                      United States Magistrate Judge
                                      Eastern District of New York